# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---

### NO. 03-19-00031-CR

---

### Stephanie Kizima, Appellant

### v.

### The State of Texas, Appellee

---

### FROM THE 277TH DISTRICT COURT OF WILLIAMSON COUNTY
### NO. 17-1203-K277, THE HONORABLE STACEY MATHEWS, JUDGE PRESIDING

---

### M E M O R A N D U M   O P I N I O N

Stephanie Kizima was charged with committing aggravated assault with a deadly weapon against a family member, her husband James Kizima.[1] *See* Tex. Penal Code §§ 22.01(a), .02(a). The jury found Kizima guilty of the charged offense and sentenced her to two years' imprisonment but recommended that she be placed on community supervision. *See id.* §§ 12.33, 22.02(b). The trial court rendered its judgment of conviction placing Kizima on community supervision for two years and made an affirmative finding of family violence. On appeal, Kizima challenges the sufficiency of the evidence supporting her conviction and asserts that there was reversible error in the jury charge. We will affirm the trial court's judgment of conviction.

---

[1] Because Kizima and James Kizima share the same surname, we will refer to James Kizima by his first name.

## BACKGROUND

After Kizima was charged with aggravated assault with a deadly weapon, a trial was convened in which the following witnesses testified: James, paramedics Judy Splain and Wes Kukulski, Officers Mark Huntley and Mark Bell, crime-scene supervisor Jennifer Smith, and Kizima.

James testified that he was living with Kizima and their two children, R.K. and A.K., on the day of the alleged offense. Further, he stated that he previously worked for the Department of Criminal Justice as a prison guard, was taught "some defensive tactics" through his employment, and had a red belt in taekwondo. Moreover, James stated that in the days leading up to the incident in question, he caught Kizima beating their son R.K., asked her to stop, and told R.K. to call the police if something like that occurred again.

Regarding the day of the offense, James related that he drove home after running errands and noticed that Kizima had been crying. Next, James discussed how Kizima informed him that their relationship was over because of something that R.K. told her, and James speculated that R.K. must have mentioned the conversation in which he told R.K. to call the police if Kizima hurt him again. James testified that Kizima then forcefully dragged R.K. away and that he got out his phone to record her because he was afraid that Kizima would assault R.K. again. Further, James related that Kizima saw the phone, charged at him, and hit him "with her closed fist several times upside the head." James also explained that he put his "arm back" and may have contacted Kizima's shoulder when trying to call 911 and that she tried to take his phone away, knocked the phone to the floor, and grabbed "a really big knife" from a kitchen drawer while he picked up his phone.

2

Regarding the assault, James testified that he blocked Kizima's first attempt to stab his "stomach area," that she later cut his abdomen, and that she stabbed him "several times with that knife across [his] right shoulder." Next, James explained that he ran toward the front door, that Kizima slammed the door on his right arm as he was leaving the house, and that she cut his forearm while it was caught in the doorway. In his testimony, James admitted that he told an officer that he did "a couple of elbow strikes to get [Kizima] off of" him while trying to defend himself and explained that elbow strikes are defensive moves used to get someone off of you, which he practiced in taekwondo. Further, James related that he called 911 after freeing himself from the front door, observed Kizima back out of the garage in their car, and tried unsuccessfully to stop the car from leaving the area because he was afraid that their two children were in the car. When describing his injuries, James testified that he was taken to the hospital for treatment, that one of the wounds became infected, and that he has scars from the assault, but he also explained that he did not receive any stitches. Photographs of the injuries that James sustained and of the knife were admitted into evidence during the trial.

After James finished testifying, one of the paramedics who treated him on the day in question testified. When describing James's appearance that day, Splain stated that James had "obvious trauma," multiple superficial lacerations that "appeared to be fresh," "trauma to the head," abrasions on "the right side" of his face, a "laceration to his abdomen," and "minor dried blood" on his injuries. Splain also related that James had a hematoma on his elbow and explained that those types of hematomas usually occur when someone's elbow contacts a hard surface. Next, Splain recalled that James repeatedly stated that "[s]he cut me" and mentioned being hit in the head. Further, Splain explained that James's injuries were consistent with being caused by a serrated blade because the lacerations were jagged and that she believed that the

3

knife was capable of causing serious bodily injury or death based on the injuries James sustained and the type of knife used.

During the trial, one of the officers who drove to the Kizimas' home testified. Officer Huntley observed that James had obvious fresh injuries to his abdomen, arm, upper arm, and shoulder but also observed that James did not have much blood on him. When discussing the injuries, Officer Huntly testified that the injuries would not require invasive treatment. Additionally, Officer Huntley stated that there was blood spatter on the wall and floor near the front door, on the interior part of the front door, and in the kitchen near the island. Further, Officer Huntley related that he found "a rather large serrated knife" in the kitchen that he believed was nine or ten inches long and described the knife as "most certainly" being capable of causing death or serious bodily injury. Similarly, a crime scene supervisor, Smith, later testified that the knife was serrated and that the entire knife was thirteen and a half inches long. In his testimony, Officer Huntley recalled that he told another officer that James's injuries were consistent with James's description of the events in question but admitted that he had not heard Kizima's version of events when he made that assessment. Moreover, Officer Huntley recalled that James mentioned that he might have performed elbow strikes during the altercation.

After Officer Huntley finished testifying, the State called Officer Bell, who observed Kizima driving from the area and pulled her over. Officer Bell recalled that Kizima had lacerations on her hands and that she had a white cloth wrapped around her hand with blood on it. Further, Officer Bell related that in his experience individuals who use knives during altercations can injure their hands. Additionally, although Officer Bell mentioned that he had been informed that James may have performed elbow strikes, he did not observe any injuries, bruising, or swelling to Kizima's face during his investigation. Officer Bell testified that Kizima

4

told him that her tooth was chipped during the altercation but that he did not see any damage to her teeth, gums, or lips that night; however, when showed a photo of Kizima's mouth, Officer Bell admitted that he could now see differences between her front teeth that he did not notice on the day in question.

Once Officer Bell finished testifying, the State called the paramedic who treated Kizima on the night in question. In his testimony, Kukulski related that Kizima told him that she had been punched in the face, that her tooth had been chipped, and that she had pain in her front teeth; however, Kukulski also testified that he did a thorough examination of Kizima's face and head, did not see any signs of trauma, and did not notice any chipped teeth. Additionally, Kukulski commented that people who lose a part of a tooth during a fight usually have an obvious "missing part" of a tooth along with inflamed lips and gums. Further, Kukulski explained that Kizima never complained about any injury to her chin and that he would expect for an injury to appear red before any bruising develops. After viewing a photo of Kizima's teeth, Kukulski admitted that it was possible that one of her front teeth looked different from the others but explained that it was not possible to tell from the photo when that occurred. Relatedly, Kukulski testified that he noted in his report that Kizima's injury to her teeth was caused by a blunt object, that the angle from which someone is struck might affect whether there was lip or gum trauma, and that it was possible that James's elbow struck her. Additionally, Kukulski related that Kizima stated that she grabbed the knife to make James stop and cut herself with the knife during the struggle.

During her case-in-chief, Kizima elected to testify. In her testimony, Kizima denied spanking or hitting R.K. days before the incident in question and further denied dragging R.K. away from James on the day of the incident. Further, Kizima stated that she and James got

5

into an argument and that she told him that she was going to leave him after R.K. told her that James believed she was a bad mother and encouraged R.K. to hate her. Next, Kizima related that James approached her and "got up into [her] face" after she said that she wanted to leave him, that she pushed him away, and that he "elbowed [her] to the face." When describing this incident, Kizima stated that the force of the blow chipped her tooth, that she had a bruise on her chin from this incident, and that the exhibit of her booking photo admitted into evidence showed a bruise on her chin. Further, Kizima related that she fell backwards toward the kitchen after being hit, that James started to approach her again, and that she grabbed a knife from the kitchen. Although Kizima admitted that she swung the knife and that the knife was capable of causing serious bodily injury or death, she denied having any intent to hurt James; instead, Kizima explained that she only used the knife to try to keep James away from her and that she felt that she had to defend herself and prevent him from hurting or killing her because he had martial-arts training and other similar training through his employment. In her testimony, Kizima stated that James tried to kill her a few months earlier by choking her and, accordingly, that she was afraid for her life when he approached her on the day in question.

Further, Kizima related that when she swung the knife, she injured her hand in the process. Additionally, Kizima stated that she threw the knife in the sink when James walked outside, placed her children in the car in the garage, and backed out of the garage. Moreover, Kizima stated that James tried to block her path, hit the window, and screamed at her as she left. Further, Kizima admitted that she did not call the police after leaving the house, told the police when she was being arrested that she "should have just run" from them, and told the police that she cut James four or more times. Kizima also admitted that James did not have a weapon during the incident.

6

During the charge conference, Kizima requested an instruction on self-defense, and the trial court granted the request. After considering the evidence presented at trial, the jury found Kizima guilty of aggravated assault with a deadly weapon.

## DISCUSSION

**Sufficiency of the Evidence**

In her first issue on appeal, Kizima contends that the evidence is insufficient to support her conviction for aggravated assault with a deadly weapon because "no rational trier of fact would have found the essential elements of the offense beyond a reasonable doubt and would have found against [her] on the self-defense issue beyond a reasonable doubt."

Under the Penal Code, an individual commits the offense of assault if she "intentionally, knowingly, or recklessly causes bodily injury to another" and commits the offense of aggravated assault if she "uses or exhibits a deadly weapon during the commission of the assault." Tex. Penal Code § 22.01(a), .02(a). The legislature has defined "'[b]odily injury'" as meaning "physical pain, illness, or any impairment of physical condition" and a "'[d]eadly weapon'" as "a firearm or anything manifestly designed, made, or adapted for the purpose of inflicting death or serious bodily injury" or "anything that in the manner of its use or intended use is capable of causing death or serious bodily injury." *Id.* § 1.07(a)(8), (17).

The Penal Code also specifies that "[i]t is a defense to prosecution that the conduct in question is justified under" chapter nine. *Id.* § 9.02. One justification listed in that chapter is self-defense, which provides that "a person is justified in using force against another when and to the degree the actor reasonably believes the force is immediately necessary to protect the actor against the other's use or attempted use of unlawful force." *Id.* § 9.31(a). "The

7

use of force against another is not justified . . . if the actor provoked the other's use or attempted use of unlawful force, unless . . . the actor abandons the encounter, or clearly communicates to the other his intent to do so reasonably believing he cannot safely abandon the encounter" and unless "the other nevertheless continues or attempts to use unlawful force against the actor." *Id.* § 9.31(b)(4).

Moreover, the use of deadly force is only justified in the circumstances set out by the Penal Code. *Id.* § 9.31(d). Of significance to this case, "[a] person is justified in using deadly force against another . . . if the actor would be justified in using force against the other" as set out above and "when and to the degree the actor reasonably believes the deadly force is immediately necessary . . . to protect the actor against the other's use or attempted use of unlawful deadly force." *Id.* § 9.32(a). "A person has the right to defend himself from apparent danger to the same extent as he would if the danger were real." *Dugar v. State*, 464 S.W.3d 811, 818 (Tex. App.—Houston [14th Dist.] 2015, pet. ref'd) (quoting *Hamel v. State*, 916 S.W.2d 491, 493 (Tex. Crim. App. 1996)). Accordingly, "under certain circumstances, a person may use deadly force against another, even if the other was not actually using or attempting to use unlawful deadly force." *Id.* "The reasonableness of a person's belief that force is immediately necessary is viewed from the person's standpoint at the time that he acted." *Id.*

Under a legal-sufficiency standard of review, appellate courts view the evidence in the light most favorable to the verdict and determine whether "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). When performing this review, an appellate court must bear in mind that it is the factfinder's duty to weigh the evidence, to resolve conflicts in the testimony, and to make "reasonable inferences from basic facts to ultimate facts." *Id.*; *see also* Tex. Code Crim.

8

Proc. art. 36.13 (explaining that "jury is the exclusive judge of the facts"). The factfinder is "free to apply common sense, knowledge, and experience gained in the ordinary affairs of life in drawing reasonable inferences from the evidence." *Eustis v. State*, 191 S.W.3d 879, 884 (Tex. App.—Houston [14th Dist.] 2006, pet. ref'd). Appellate courts must "determine whether the necessary inferences are reasonable based upon the combined and cumulative force of all the evidence when viewed in the light most favorable to the verdict." *Hooper v. State*, 214 S.W.3d 9, 16-17 (Tex. Crim. App. 2007).

Furthermore, appellate courts presume that conflicting inferences were resolved in favor of the conviction and "defer to that determination." *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007). Courts also must bear in mind that "direct and circumstantial evidence are treated equally" and that "[c]ircumstantial evidence is as probative as direct evidence in establishing the guilt of an actor" and "can be sufficient" on its own "to establish guilt." *Kiffe v. State*, 361 S.W.3d 104, 108 (Tex. App.—Houston [1st Dist.] 2011, pet. ref'd). "However, juries are not permitted to come to conclusions" that are based on mere speculation or on inferences or presumptions that are not factually supported. *Braughton v. State*, 569 S.W.3d 592, 608 (Tex. Crim. App. 2018). The evidence is legally insufficient if "the record contains no evidence, or merely a 'modicum' of evidence, probative of an element of the offense" or if "the evidence conclusively establishes a reasonable doubt." *Kiffe*, 361 S.W.3d at 107 (quoting *Jackson*, 443 U.S. at 320).

"The defendant has the initial burden of production and must bring forth some evidence to support" his claim of self-defense. *See Dearborn v. State*, 420 S.W.3d 366, 372 (Tex. App.—Houston [14th Dist.] 2014, no pet.). "Once the evidence is produced, the State bears the burden of persuasion to disprove the defense." *Id.* "This burden does not require the

9

production of additional evidence rebutting self-defense; it requires the State to prove its case beyond a reasonable doubt." *Id.* "When the trier of fact finds the defendant guilty, there is an implicit finding rejecting the defendant's self-defense theory." *Id.* "Because the State bears the burden of persuasion to disprove a" claim of self-defense "by establishing its case beyond a reasonable doubt, we review . . . sufficiency challenges to the . . . rejection of such a defense under" the legal-sufficiency standard. *See Smith v. State*, 355 S.W.3d 138, 145 (Tex. App.—Houston [1st Dist.] 2011, pet. ref'd); *cf. Brooks v. State*, 323 S.W.3d 893, 895 (Tex. Crim. App. 2010) (providing that "legal-sufficiency standard is the only standard that a reviewing court should apply in determining whether the evidence is sufficient to support each element of a criminal offense").

When addressing a claim that the evidence was legally insufficient to support the rejection of a self-defense claim, appellate courts "examine all of the evidence in the light most favorable to the verdict to determine whether any rational trier of fact could have found beyond a reasonable doubt (1) the essential elements of the alleged offenses, and (2) against appellant on the self-defense issue." *Dearborn*, 420 S.W.3d at 372. The trier of fact "is the sole judge of the credibility of the witnesses and the weight to be given their testimony." *Id.* at 372-73. Accordingly, "[t]he trier of fact is free to accept or reject defensive evidence on the issue of self-defense," and appellate courts "presume the trier of fact resolved any conflicting inferences and issues of credibility in favor of the judgment." *Id.* at 373. "Moreover, when there is evidence, if believed, to support a claim of self-defense, but other evidence, if believed, to support a conviction, an appellate court will not weigh in on this fact-specific determination as this is a function of" the trier of fact. *See McFadden v. State*, 541 S.W.3d 277, 285 (Tex. App.—Texarkana 2018, pet. ref'd).

10

Viewing the evidence in the light most favorable to Kizima's conviction, evidence was presented at trial demonstrating that she hit James on the head multiple times before picking up a knife that was over thirteen inches long and repeatedly and deliberately swinging the knife at James causing lacerations to his arm, shoulder, and abdomen and resulting in his being taken to the hospital for treatment. Moreover, multiple witnesses testified that the way Kizima used the knife was capable of causing serious bodily injury or death. Accordingly, the evidence is legally sufficient to support Kizima's conviction for aggravated assault with a deadly weapon. *See* Tex. Penal Code § 22.02; *see also Gross v. State*, No. 07-03-00484-CR, 2004 WL 1469418, at *1-2 (Tex. App.—Amarillo June 30, 2004, pet. ref'd) (mem. op., not designated for publication) (deciding that evidence was sufficient to show that knife was deadly weapon, in part, because evidence showed that knife "was not only sharply pointed but also serrated in part"); *Rodriguez v. State*, 857 S.W.2d 102, 107 (Tex. App.—Corpus Christi 1993, no pet.) (explaining in sufficiency analysis that rational trier of fact could find knife to have been deadly weapon where it was used to stab victim, where victim sustained wounds to his chest that were "one-half inch deep," where victim went to hospital for treatment, and where witness testified that "three-inch blade was capable . . . of causing serious bodily injury or death").

In her brief, Kizima argues that there was insufficient evidence to support the jury's rejection of her self-defense claim because evidence was presented at trial establishing that James had received training through his work and through his taekwondo classes, that the conflict started because she told James that she was leaving him, that James "got up into [her] face," that James hit her shoulder before she grabbed the knife, that James admitted that he struck Kizima with his elbow multiple times during the altercation, that one of the elbow strikes injured her chin and caused her to fall backward into the kitchen, that she only grabbed the knife

11

when he approached her again, that she used the knife to keep him away from her, that she did not intend to hurt him, and that she was afraid for her life because of a prior incident a few months earlier in which he choked her. Further, Kizima asserts that the evidence established that James's injuries were superficial in nature but that his assault on her chipped one of her teeth and resulted in an injury to her chin. Moreover, Kizima contends that the injuries that James sustained were consistent with her testimony that she only swung the knife to keep him away from her. Additionally, Kizima argues that she left home in her car in order to find a safe place for her and her children away from James. Kizima argues that the evidence showed that she had a reasonable belief that she was in danger when she grabbed the knife and used it to defend herself.

Although Kizima refers to evidence that arguably might support her claim of self-defense, other evidence was presented at trial that contradicted that claim, and we must presume that the jury resolved any conflicting inferences and issues of credibility in favor of the conviction. For example, James testified that Kizima initiated the altercation by striking his head multiple times when she saw that he was attempting to record the way that she was treating R.K. Further, James explained that Kizima picked up the knife while he was attempting to pick up his phone, cut his abdomen, stabbed him multiple times on his shoulder and arm, pinned his arm in the front door when he tried to get away from her by leaving the house, and continued to stab his arm. Moreover, James related that he may have contacted Kizima's shoulder with his arm after she hit him on the head and that he only tried to strike her with his elbow when trying to defend himself. Additionally, the officer who responded to James's house and the paramedic who treated James testified about the visible injuries on various parts of James's body, including an injury to his head and lacerations to his abdomen, arm, and shoulder, and the paramedic testified

12

that James said that "[s]he cut me." Further, the officer testified that there was blood spatter on and near the front door to the home. In addition, the officer who interacted with Kizima shortly after the incident testified that he did not observe any injuries to her face. Similarly, the paramedic who treated Kizima explained that he did not see any signs of trauma to her face. Moreover, James testified that he called the police after the incident and that Kizima fled the scene in their car, and she admitted at trial that she told one of the officers that she should have just run away from the police. Additionally, Kizima admitted that James did not have a weapon during the incident.

Viewing the evidence presented at trial in the light most favorable to the verdict, we must conclude that the jury could have found all of the elements of aggravated assault with a deadly weapon beyond a reasonable doubt and also could have found against Kizima on her self-defense claim. *Cf. Mendez v. State,* 515 S.W.3d 915, 921-22 (Tex. App.—Houston [1st Dist.] 2017) (noting that defendant pointed to evidence that victim was first aggressor and had "reputation for violence" but concluding that evidence was sufficient to support rejection of self-defense claim after explaining that defendant ignored evidence refuting self-defense, including testimony that defendant "'hit' [victim] first," that victim was unarmed, and that victim did not have reputation for violence), *aff'd*, 545 SW.3d 548 (Tex. Crim. App. 2018); *Ramirez v. State*, No. 14-07-00060-CR, 2008 WL 3931403, at *4 & n.5 (Tex. App.—Houston [14th Dist.] Aug. 21, 2008, pet. ref'd) (mem. op., not designated for publication) (observing that "[l]eaving the scene of a crime indicates a consciousness of guilt" and concluding that evidence was sufficient to support conviction where defendant immediately left scene "rather than staying at the location and attempting to determine if the decedent was alive, offer help, or turn himself into authorities"); *Heng v. State*, No. 01-04-00450-CR, 2006 WL 66461, at *4 (Tex. App.—

13

Houston [1st Dist.] Jan. 12, 2006, pet. ref'd) (mem. op., not designated for publication) (determining that evidence was sufficient to support rejection of self-defense claim where evidence showed that defendant armed himself, that victim had no weapon, and that defendant shot victim multiple times).

For these reasons, we overrule Kizima's first issue on appeal.

**Jury Charge**

In her second issue on appeal, Kizima presents several arguments asserting that there were errors in the portions of the jury charge pertaining to self-defense and that she was harmed by those errors.

The relevant abstract portion of the charge reads as follows:

A person is justified in using force against another when and to the degree he or she reasonably believes the force is immediately necessary to protect himself or herself against the other's use or attempted use of unlawful force.

When a person is attacked with unlawful deadly force, or he or she reasonably believes he or she is under attack or attempted attack with unlawful deadly force, and there is created in the mind of such person a reasonable expectation or fear of death or serious bodily injury, then the law excuses or justifies such person in resorting to deadly force by any means at his or her command to the degree that he or she reasonably believes immediately necessary, viewed from his or her standpoint at the time, to protect himself or herself from such attack or attempted attack.

. . .

A person is justified in using deadly force against another:

(1) If the person would be justified in using force against the other in the first place, as set out above; and

(2) When and to the degree the person reasonably believes the deadly force is immediately necessary[.]

. . .

14

Therefore, even if you find that the State has proven that the defendant committed the offense of aggravated assault beyond a reasonable doubt, . . . you must decide whether the State has proven that the defendant's conduct was not justified.

In the application portion, the jury charge reads in relevant part as follows:

But, [if] you further find from the evidence, or you have a reasonable doubt thereof, that at the time she did so, Stephanie Kiz[ima] reasonably believed, as viewed from her standpoint, that James Kizima was using or attempting to use unlawful deadly force against Stephanie Kizima, and that Stephanie Kizima reasonably believed that the use of force and degree of force used were immediately necessary to protect herself against James Kizima's use or attempted use of deadly force, or if you have a reasonable doubt as to whether or not Stephanie Kizima was acting in self-defense, then you should acquit the defendant and say by your verdict "not guilty."

However, if you find from the evidence beyond a reasonable doubt that at the time and place in question the defendant, Stephanie Kizima, under the circumstances as viewed by her from her standpoint at the time, did not reasonably believe that James Kizima was using or attempting to use unlawful deadly force against her, or that Stephanie Kizima did not reasonably believe that the use of force and the degree of force used were immediately necessary to protect herself against James Kizima's use or attempted use of unlawful deadly force, or that Stephanie Kizima did not reasonably believe that the use of force and the degree of force used were immediately necessary to protect herself against James Kizima's use of force, then you should find against the defendant on the pleas of justification of self-defense or if you find beyond a reasonable doubt that Stephanie Kizima was not acting in self-defense, then you should convict the defendant and say by your verdict "guilty."

In her first set of arguments in her second issue, Kizima asserts that there was error in the charge because the charge assumed that the force used by her was deadly force, which she urges was an impermissible comment on the weight of the evidence presented at trial. *See* Tex. Code Crim. Proc. art. 36.14; *Brock v. State*, 495 S.W.3d 1, 13-14 (Tex. App.—Waco 2016, pet. ref'd). As support for this proposition, Kizima refers to portions of the application section of the charge addressing whether James was using deadly force during the altercation. Moreover, Kizima contends that she was entitled to but was not given "an instruction on non-

15

deadly force self-defense" because the issue was raised by the evidence presented at trial. For example, Kizima refers to evidence indicating that James's injuries were superficial. Moreover, Kizima argues that the weapon used in the altercation was not a deadly weapon per se and, therefore, that the use of the knife did not necessarily constitute deadly force. *See* Tex. Penal Code § 1.07(a)(17). Further, Kizima insists that the terms of the jury charge did not afford the jury the "option of finding that the force given was nondeadly." For these reasons, Kizima contends that there were errors in the charge.

When addressing an issue regarding an alleged jury-charge error, appellate courts must first decide whether there is error before addressing whether the alleged error resulted in any harm. *See Ngo v. State*, 175 S.W.3d 738, 743 (Tex. Crim. App. 2005). As set out above, the abstract portion of the jury charge included instructions for self-defense involving non-deadly force and for self-defense involving the use of deadly force, and those instructions generally tracked the statutory language from sections 9.31 and 9.32 of the Penal Code. *See* Tex. Penal Code §§ 9.31(a), .32. Further, the abstract portion explained that even if the State proved that Kizima committed the offense beyond a reasonable doubt, the jury had to consider whether her actions were justified and did not limit the jury's consideration to whether Kizima used deadly force that was justified. Additionally, although one portion of the application section of the charge directed the jury to consider whether Kizima believed that James was using or attempting to use deadly force, that section did not indicate that Kizima used deadly force during the incident. On the contrary, that portion of the application section instructed the jury that it should acquit Kizima if it had a reasonable doubt as to whether she "was acting in self-defense" or as to whether she "reasonably believed that the force and degree of force used" by her "were immediately necessary to protect herself." Perhaps more importantly, the next portion of the

16

application section instructed the jury that it should convict Kizima if it determined beyond a reasonable doubt that she "did not reasonably believe that the use of force and the degree of force used" by her "were immediately necessary to protect herself against James Kizima's use or attempted use of deadly force" *or* "against James Kizima's use of force."

We conclude that both the abstract and application sections of the charge adequately incorporated the requirements from sections 9.31 and 9.32 of the Penal Code explaining when self-defense and self-defense using deadly force are authorized. *See* Tex. Penal Code §§ 9.31, .32. Accordingly, we cannot agree with Kizima's assertion that there was no self-defense instruction pertaining to the use of non-deadly force. Similarly, given that the application portion of the jury charge did not specify whether Kizima was using non-deadly or deadly force in the self-defense instruction and clarified that the jury could consider whether her actions were justified in response to the force or deadly force used by James, we conclude that the jury charge did not improperly assume that she used deadly force during the incident.[2]

---

[2] In her briefing, Kizima contends that we should not apply the typical presumption that the jury understood and applied the trial court's charge because the jury instructions were incomprehensible and included lengthy run-on sentences. Although the charge arguably could have been written more clearly, we cannot agree with Kizima's suggestion that the charge is incomprehensible. The abstract portion sets out the law on self-defense and deadly-force self-defense, and the application portion instructed the jury regarding the circumstances in which it should convict Kizima or acquit her. Moreover, the case that Kizima relies on when making this argument concluded that the presumption should not apply in the analysis evaluating whether the defendant was *harmed* by the conceded error in the charge because the charge was "a six-page impenetrable forest of legal 'argle-bargle'" and included an instruction on provocation that improperly limited the application of the self-defense instruction. *See Reeves v. State*, 420 S.W.3d 812, 816-19 (Tex. Crim. App. 2013). As set out above, we conclude that the charge did not contain the errors suggested by Kizima and, therefore, do not reach the issue of harm.

17

In her next set of arguments, Kizima contends that there was error in the jury charge because the charge failed to include her requested instruction under section 9.04 of the Penal Code.[3] *See* Tex. Penal Code § 9.04.

Section 9.04 pertains to threats to use force and provides as follows:

> The threat of force is justified when the use of force is justified by this chapter. For purposes of this section, a threat to cause death or serious bodily injury by the production of a weapon or otherwise, as long as the actor's purpose is limited to creating an apprehension that he will use deadly force if necessary, does not constitute the use of deadly force.

*See id.* Section 9.04 is not a separate statutory defense and is instead incorporated within the law of self-defense. *See Gamino v. State*, 537 S.W.3d 507, 510 n.12 (Tex. Crim. App. 2017).

On appeal, Kizima contends that an instruction under section 9.04 should have been included in the charge. Although Kizima acknowledges that the statutory provision applies when an individual threatens to use force and when an individual makes a threat by producing a weapon, she argues that the legislature's use of the phrase "or otherwise" broadens the applicability of the statute to situations beyond those involving the brandishing of a weapon. In fact, Kizima asserts that the statute should apply to circumstances in which an individual uses a weapon "to keep someone away in a manner that is limited to the infliction of superficial scratches" because that type of action would qualify as a threat. Building on these assertions,

---

[3] In its brief, the State contends that this Court should not address the second set of arguments because those arguments are multifarious. *See Davidson v. State*, 249 S.W.3d 709, 717 n.2 (Tex. App.—Austin 2008, pet. ref'd) (explaining that issue containing "more than one specific ground of error is a multifarious one" and that appellate courts "may refuse to consider it"). To the extent that these arguments are multifarious, we address this second set of arguments in the interests of justice. *See id.* (explaining that appellate courts "may consider multifarious issues if [they] can determine, with reasonable certainty, the alleged error about which the complaint is made").

Kizima contends that the evidence at trial demonstrated that an instruction under section 9.04 should have been but was not given.

The Code of Criminal Procedure compels trial courts to provide "a written charge distinctly setting forth the law applicable to the case." Tex. Code Crim. Proc. art. 36.14. Under the right circumstances, a trial court must provide an instruction on any statutory defense, including justification defenses, raised by the evidence. *Walters v. State*, 247 S.W.3d 204, 208-209 (Tex. Crim. App. 2007). "[A] defendant has the right to an instruction on every defensive issue raised by the evidence, regardless of whether the evidence is strong, feeble, unimpeached, or contradicted, and even when the trial court thinks that the testimony raising the defense is not worthy of belief." *Johnson v. State*, 271 S.W.3d 359, 362 (Tex. App.—Beaumont 2008, pet. ref'd). "When reviewing a trial court's decision denying a request for a self defense instruction, we view the evidence in the light most favorable to the defendant's requested submission." *Gamino*, 537 S.W.3d at 510. "A trial court errs in denying a self defense instruction if there is some evidence, from any source, when viewed in the light most favorable to the defendant, that will support the elements of self defense." *Id.*

By its terms, section 9.04 applies in circumstances in which a defendant makes some type of threat to use force. *See* Tex. Penal Code § 9.04. A "threat" is "an expression of *intention* to inflict evil, injury, or damage." *See Threat Definition*, Merriam-Webster.com, https://www.merriam-webster.com/dictionary/threat (emphasis added). Even viewing the evidence in the light most favorable to the instruction Kizima asserts should have been given, the evidence, including her testimony, establishes that she used a knife and caused bodily injury to James and, accordingly, went beyond expressing an intention to inflict injury or damage. Moreover, we have not been pointed to any authority for the proposition that section 9.04 applies

19

in circumstances in which the defendant uses a weapon to cause bodily injury to the victim. *See Gamino*, 537 S.W.3d at 511-12 (concluding that trial court should have included in charge self-defense instruction under section 9.31 and 9.04 where there was evidence that three men threatened defendant and his girlfriend, that defendant felt like his life was in danger, and that defendant displayed his gun, told "the complainant and others to 'stop,' 'get away,' and leave us alone" because threat to use force if necessary was implied); *Reynolds v. State*, 371 S.W.3d 511, 522 (Tex. App.—Houston [1st Dist.] 2012, pet. ref'd) (deciding that instruction under section 9.04 should have been given in aggravated-assault case where evidence was presented at trial indicating that defendant did not intend to shoot anyone and brought his gun in hopes of scaring group away from his friend, and accordingly, that "his purpose in threatening to use deadly force was" limited to creating apprehension that he would use deadly force if necessary).

On the contrary, cases addressing the omission of an instruction under section 9.04 have indicated that the omission is not erroneous when the defendant does more than threaten the alleged victim. *See Pham v. State*, 595 S.W.3d 769, 779 (Tex. App.—Houston [14th Dist.] 2019, pet. granted) (determining that defendant was not entitled to instruction under section 9.04 "[b]ecause he did use deadly force, rather than the threat of deadly force"); *Robic v. State*, No. 05-16-00337-CR, 2017 WL 2665269, at *5 (Tex. App.—Dallas June 21, 2017, pet. ref'd) (mem. op., not designated for publication) (rejecting assertion that hypothetically correct jury charge would have included instruction under section 9.04 because case involved use of deadly force rather than threat of force); *Jaimes v. State*, No. 03-96-00230-CR, 1997 WL 420978, at *1, *3 (Tex. App.—Austin July 24, 1997, pet. ref'd) (op., not designated for publication) (concluding that omission of instruction under section 9.04 was not error where defendant admitted that he shot victim in self-defense). Accordingly, we cannot agree with Kizima's

20

assertion that the failure to include a section 9.04 instruction under the circumstances present here was error.

For these reasons, we overrule Kizima's second issue on appeal.

## CONCLUSION

Having overruled both of Kizima's issues on appeal, we affirm the trial court's judgment of conviction.

_____

Thomas J. Baker, Justice

Before Justices Goodwin, Baker, and Kelly

Affirmed

Filed:   October 22, 2020

Do Not Publish